2018 IL App (1st) 143616-U
No. 1-14-3616

SECOND DIVISION
August 11, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 3927 |
| | ) | |
| DESMOND MYRICK, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Charles P. Burns, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1 *Held:* defendant's criminal sexual assault convictions affirmed where the circuit court did not abuse its discretion in permitting the State to introduce evidence of defendant's involvement in a prior sexual assault where the evidence was relevant and more probative than prejudicial.

¶ 2 Following a bench trial, defendant was convicted of two counts of sexual assault and was sentenced to 12 years' imprisonment. On appeal, defendant seeks reversal of his convictions, arguing that the circuit court erred in admitting other crimes evidence because his prior crime was too dissimilar to the crime with which he was charged and was therefore inadmissible in the current case. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3    BACKGROUND

¶ 4    Following an encounter with 18-year-old D.M. on February 22, 2011, 32-year-old defendant was arrested and charged with two counts of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2010)) and two counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2010)).

¶ 5    Pre-Trial Proceedings

¶ 6    Prior to trial, the State filed a motion seeking to introduce proof of defendant's other crimes, specifically his involvement in two prior sexual assaults.   Aggravated criminal sexual assault and criminal sexual assault charges brought against defendant in case number 11 CR 13510 stemmed from his assault of 18-year old L.H. on September 23, 2006.   In that case, defendant followed the victim when she exited a bus at 67th and Cornell at approximately 1:30 a.m.  He put a box cutter to her throat and led to her an apartment basement located at 1512 E. 68th Street.  At that location, defendant struck the victim on the left side of her face and forced her to remove her clothing, perform oral sex, and engage in vaginal sex.  After forcing L.H. to engage in unwanted sexual activity, defendant fled the scene.  The victim reported the assault and went the hospital where a rape kit was administered.  DNA recovered from the rape kit was matched to defendant.

¶ 7    Aggravated criminal sexual assault and criminal sexual assault charges were also brought against defendant in case number 11 CR 14511.  Those charges stemmed from his sexual assault of 15-year old J.S. on June 15, 2008.  In that case, defendant approached the victim from behind at approximately 2:30 a.m. as she was walking home.  When she ignored his attempts to engage in conversation, defendant grabbed her and pulled her onto a bike path and punched her.  He stole $15 from her and forced her to remove her clothes, perform oral sex, and engage in vaginal sex.  Defendant then led to her a backyard and again forced the victim to engage in unwanted oral and

vaginal sex. Defendant informed the victim that she would spend the night with him and led her to an area near a bridge and again forced her to perform oral sex. Afterwards, he took the victim to a McDonald's restaurant and gave her some money so she could take a bus home. The victim reported the assault to her mother and she was taken to the hospital where a rape kit was administered. DNA from the rape kit was matched to defendant.

¶ 8    In its motion seeking to admit defendant's other crimes, the State alleged: "In all the cases the victim was between eighteen years of age and fifteen [years of age]. The defendant would approach the women when they were alone. The defendant would approach the victims in the late evening or early morning hours when there was no one else around. The defendant would take the women to an isolated and secluded location and sexually assault them. The defendant would hit the victims. The defendant forced each victim to perform oral and vaginal sex." The State argued that given the "factual similarities" of defendant's prior crimes to offense with which he was currently charged that the "probative value" of the prior offenses "outweigh[ed] any undue prejudice to the defendant and the proof of other crimes should be allowed to establish intent, motive, knowledge, lack of mistake, or accident and propensity."

¶ 9    In response, defendant indicated he would be proceeding with a consent defense at trial and argued that the other crimes evidence did not share enough "commonality to the instant cause" to establish *modus operandi* or intent and that the admission of the other crimes evidence would be more prejudicial than probative.

¶ 10    Following a hearing on the State's motion, the court ruled that the State would be permitted to introduce evidence of defendant's 2008 assault of J.S., but would be precluded from introducing evidence of his 2006 sexual assault of L.H. In so holding, the court found that defendant's use of a weapon, specifically a box cutter, during his assault of L.H. rendered that case too factually

dissimilar from his assault of D.M. and that the admission of that crime would create a "threat of undue prejudice" to defendant. In contrast, the court found that there were sufficient factual similarities between defendant's assault of J.S. and his assault of D.M. and that the admission of evidence of J.S.'s assault was more probative than prejudicial. The court noted that in both instances, defendant brought the victims to isolated locations and to McDonald's restaurants and concluded that the "consistent pattern" of behavior that defendant demonstrated in both instances warranted the admission of evidence of his assault of J.S. The court specifically found that the other crimes evidence was probative and "relevant for *modus operandi*, lack of mistake, and also on the issue of consent."

¶ 11    Following the court's ruling and prior to trial, defendant sought to challenge the court's earlier ruling and filed a motion *in limine* to preclude the State from being permitted to introduce other crimes evidence of his assault of J.S. In the motion, defendant alleged there was an "absence of factual similarities" between his assault of J.S. and his assault of D.M. and urged the court to reconsider its prior ruling. The court, however, denied the motion and reiterated that the other crimes evidence would only be considered for a "limited purpose."

¶ 12    Trial

¶ 13    At trial, D.M. testified that at approximately 10 p.m. on February 22, 2011, she walked to Big Sam's, a local convenience store located 119th and Stewart to purchase "swishers," a type of paper people use to "roll their weed up." After purchasing the swishers, she began walking down 119th Street toward Harvard, intending to purchase some marijuana. As she was walking, defendant, who had been driving on 119th Street, stopped his vehicle, exited the car, approached her, and initiated a conversation with her. Specifically, defendant asked her name, where she lived, and what she was doing that night. D.M. testified that had seen defendant in the neighborhood "in

passing," but had never spoken to him before that evening. Defendant identified himself as "D" and asked her if she wanted to "match blunts," meaning smoke marijuana together, and she responded "yes." She then entered the front passenger side of defendant's vehicle and defendant began driving to a location where they could purchase marijuana. After stopping to buy marijuana, defendant made a second stop at a liquor store where he purchased alcohol. Defendant then drove to a "little neighborhood with houses" and parked the car. The two smoked marijuana together and defendant also consumed alcohol. Afterwards, defendant drove to a "wooded area" with which D.M. was unfamiliar and parked his car. When D.M. told defendant that she wanted to go home because her mother was expecting her, defendant told her that he wanted to purchase more marijuana and that he would drive her home afterwards.

¶ 14    Defendant initially "acted as if he was about to get out [of] the car," but then turned toward her and struck her in the back of her head. He continued to hit her several more times with both an open hand and a fist and told her that she "was going to give him what he wanted." D.M. was "shocked' by defendant's actions and did not respond. Defendant then grabbed a "fist-full" of her hair, called her a "b****," and told her he wanted oral sex and that she was going to give him what he wanted. D.M. became "scared" because she "didn't know what [defendant] was capable of." Defendant continued holding her hair with one hand and used the other to unzip his pants. He then "forced" her head down toward his penis and forced her to perform oral sex. D.M. began crying because she did not want defendant's penis in her mouth. After a while, defendant removed his penis from D.M.'s mouth and told her he wanted to have vaginal sex. D.M. repeated that she wanted to go home because it was late and her mother was expecting her. In response, defendant told her that he would drop her off early the next morning and then ordered her to remove her pants and lie down across the front seat of his car.

¶ 15    D.M. complied because she was "scared" and lowered her pants to her thighs, but defendant ordered her to take her pants "all the way off." After she did so, defendant climbed on top of her, put a condom on, and began having sex with her. She did not want his penis inside of her vagina. After a while, defendant removed his penis from D.M.'s vagina and told her that he wanted to go to a hotel. D.M. again responded that she wanted to go home, and defendant told her he would take her home after they picked up some food and spent time at a hotel. Defendant then drove to a McDonald's restaurant and placed an order at the drive-thru window. D.M. did not attempt to exit the vehicle or call for help while at the restaurant because she was scared and did not want defendant to panic and hurt her.

¶ 16    After defendant ate, D.M. convinced him to stop at a 711 convenience store to purchase more condoms. When defendant exited the vehicle and entered the store, D.M. used that opportunity to flee the vehicle and she ran up to a police officer who was nearby. She was crying, pointed to defendant, and reported that he had "just raped" her. After her outcry, the officer entered the store and arrested defendant. D.M. was then transported to the Midlothian Police Department where she spoke with additional officers. Afterwards, she was taken to Metro South Medical Center where was she was examined by a doctor and a nurse and was subjected to a criminal sexual assault kit. Medical personnel took swabs of her mouth, anus, and vagina, and collected her clothes. When D.M. presented to the hospital, she "probably [had] a little knot in the back of [her] head, on the side" and "a busted lip" as a result of defendant hitting her during the sexual assault. D.M. identified pictures of herself, defendant's vehicle, her clothing, a condom wrapper, as well as the McDonald's restaurant and the liquor store where defendant had made purchases that night.

¶ 17    On cross-examination, D.M. admitted she had smoked blunts with strangers on prior occasions and testified that she did not think defendant wanted anything other than to smoke

marijuana with her. She estimated that she smoked "about three blunts that night" and acknowledged that she was high, but testified that she was "used to smoking more than three" blunts at a time. D.M. also acknowledged that she never attempted to exit defendant's vehicle prior to 711 stop and that she never yelled for help. She also acknowledged that defendant did not personally remove her clothing and that he never physically restrained her; however, the doors of his car were locked during the assault. He did not lock the doors or restrain her when he left her in his car and entered the 711 store. D.M. could not recall how many times defendant punched her prior to and during the sexual assault, but testified that he did so more than once. She denied that she told defendant that she needed to purchase a pair of boots that cost $85 and that he gave her $60. D.M. admitted that she did not report the knot on the back of her head to medical personnel and was unable to recall whether she told the nurse that she was hit in her nose.

¶ 18    On redirect examination, D.M. explained that defendant did not do or say anything to make her afraid of him until he hit her and demanded oral sex. She further testified that defendant's vehicle had "flat locks," not raised locks and that she did not see them in the dark car. Finally, D.M. testified that she knew what was happening that night even though she was high.

¶ 19    Robert Fitzgerald, a patrol officer with the Midlothian Police Department, testified that he finished his shift at 12 a.m. on February 23, 2012, and drove to a nearby gas station located at 3950 W. 147th Street. At the time, he was still wearing his police uniform. As he was pumping gas into his vehicle, he observed another vehicle pull into the far east corner of the parking lot. A black male exited the vehicle and entered the convenience store. Officer Fitzgerald "didn't think anything of it" and continued pumping gas into his car until he was approached by D.M. She ran up to him, reported that she had just been raped, and asked for his help. She was "hysterical[]" and he noticed that her face and mouth area were a "little swollen." In addition, "there was a little

bit of blood" on her face. She pointed to defendant, the man who Officer Fitzgerald had just observed enter the convenience store, and stated, "that man raped me." Officer Fitzgerald had D.M. sit in his car and then "radioed in what was going on." After doing so, he entered the convenience store and detained defendant. Defendant was then placed in a squad car that arrived on scene and Officer Fitzgerald turned the case over to the officers who were on-duty at the time. He had never had contact with either D.M. or defendant prior to that night.

¶ 20    Midlothian Police Officer Bruce Alton testified that he responded to a radio dispatch concerning a sexual assault in the early morning hours of February 23, 2011. After receiving the dispatch, he drove to the 711 convenience store located at 3950 W. 147th Street. Once he arrived on scene, he conversed with Officer Fitzgerald. He then spoke to D.M., who was "crying" and "visibly shaken." It was apparent that she was "very scared" and he noticed some swelling to her lip. After speaking to her, Officer Alton transported D.M. to the Midlothian Police Department. Defendant, who was already in custody, was transported separately to the Midlothian Police Department. When he spoke to defendant at the station, defendant admitted that he had sex with D.M. at Ada Park and claimed that she was a prostitute. After his conversations with both D.M. and defendant, Officer Alton contacted the Chicago Police Department because "the sexual assault occurred in their jurisdiction."

¶ 21    On cross-examination, Officer Alton testified that he examined defendant's vehicle when he arrived on scene at the 711. He recalled that the keys were in the ignition; however, he did not remember if the car was still running at that time.

¶ 22    In accordance with the court's pre-trial ruling concerning the admission of other crimes evidence, J.S. provided testimony about an encounter she had with defendant on June 15, 2008, when she was 15-years-old. At approximately 2:30 a.m. that day, she left a store located near 115th

and Morgan and began walking home. As she was walking, she noticed that she was "being tailed" by defendant for several blocks. Defendant then spoke to her saying, "Little Mama, come here let me talk to you. Do you want to make some money?" J.S. continued walking and did not respond. Defendant then came up behind her and grabbed her neck "with a real firm grip" and pulled her onto a nearby bike trail. She testified that it felt like defendant "was trying to choke the life out of her." She was unable to scream or vocalize because of the pressure he put on her neck. Defendant continued to drag her and threw her against some trees. He then put an item that "felt like metal" against her back and ordered her to get on her knees and suck his penis. When she refused, defendant punched her in the right side of her face with his fist and told her to do what he asked. When J.S. again refused, defendant grabbed her neck, forced her to her knees, and forced his penis inside her mouth. J.S. testified that she did not want his penis in her mouth and that she was terrified.

¶ 23    At some point, defendant removed his penis from J.S.'s mouth and told her she "wasn't doing it right." He then ordered her to remove her clothing. She refused and defendant began trying to forcibly remove her clothing. When she struggled against his efforts, defendant hit her again in her jaw. He then threw her against the ground. She landed on her stomach and her head struck the ground. As she lay there, defendant pulled her shorts down and put his penis in her vagina. She testified that she stopped fighting and screaming and "gave up" because she wanted to "get away alive."

¶ 24    After a while defendant removed his penis from J.S.'s vagina, grabbed her off the ground, and ordered her to put on her clothes. After she did so, he threw his own shirt over her head and ordered her not to look at him. He then placed one of his hands around the back of her neck and began leading her through the bike trail. As he did so, J.S. pled for her life and told defendant that

she was only 15 years old, but he simply ordered her to "shut up" and instructed her not to look up. After they exited the bike trail, defendant led her through some alleys. J.S. was not able to see much because it was dark, defendant's shirt was over her head, and there was blood in one of her eyes. At one point, she heard voices and tried to scream, but defendant called her a "b****" and "all types of [other] name[s]" and told her that if she said anything else she was "going to regret it."

¶ 25 Defendant ultimately led to her a backyard and ordered her to get undressed. At that point, J.S. "just did what he told [her] to do" and removed her clothing. When defendant ordered her to get on top of him, however, she refused. As a result, defendant punched her, rolled her over until she was on her stomach, and put his penis inside of her vagina, and told her it "fe[lt] good." J.S. did not struggle because defendant was "a whole man" and she "wasn't about to continue to get beat and beat and beat because [she] wouldn't do what he sa[id]" to do. After he finished having sex with her, defendant again ordered her to put on her clothing. Once she did so, he placed his shirt over her head, his hand on the back of her neck, and they "walked and walked." She never screamed because she "just couldn't take that chance" that defendant would harm her. At some point as they were walking, defendant removed the shirt covering her head and told her, "This will be over soon, just do what I ask you to do and you won't get hurt."

¶ 26 They ultimately ended up at a park where defendant ordered her to get on her knees and suck his penis. When J.S. asked defendant to just let her go, defendant slapped her and said, "The sun's almost up, just do what I ask you to do and you can go." She then began to suck his penis. After a while, defendant told her he wanted to have vaginal sex again and that this time she "had to get on top of him" and that afterwards she "could leave for sure." J.S. removed her clothes and got on top of him because she felt that she "didn't have a choice," but when she did not move,

defendant rolled her over, got on top of her, and had sex with her. Afterwards, defendant told her he was "sorry" and asked if she was hungry and wanted to go to McDonald's. J.S. said "yes" and they went to a McDonald's restaurant. Again, she did not scream or seek help because she "just felt like it was pointless." Afterwards, he walked her "all the way down Halsted" and let her go. He gave her $2 to catch the bus. J.S. walked to a gas station to get change so she could use a pay phone to call her mother. When she placed the call, however, her mother did not answer. J.S. then walked home.

¶ 27 When she arrived home, she did not immediately tell her mother what happened; rather, she waited until the next day to tell her mother that she had been sexually assaulted. She explained that she did not immediately discuss the assault because she was "scared" and "felt like it was [her] fault because [she] shouldn't have been out" so late that night. Once she told her mother what happened, she was taken to the hospital. She had sustained several injuries during the course of the assault, including a blood clot in one of her eyes, a "big bruise on the side of [her] face" and a "busted lip." After receiving medical treatment, J.S. spoke to law enforcement officers. On August 8, 2011, she went to the police station to view a physical lineup. Defendant was included in the lineup and she identified him as the man who had sexually assaulted her.

¶ 28 On cross-examination, J.S. acknowledged that she initially told her mother that she had been "jumped by some girls." She further acknowledged that she never saw defendant with a vehicle and that she was never sexually assaulted in a vehicle.

¶ 29 In addition to presenting the aforementioned witnesses, the State presented a series of stipulations. Pursuant to those stipulations, Dr. James Martin would testify that he was working in the emergency room of the Metro South Medical Center on February 23, 2011, and that he

examined D.M. following an alleged sexual assault. During the exam, Dr. Martin observed "no obvious injuries" to D.M. He collected vaginal, anal, and oral swabs from D.M. using proper procedures and placed the evidence into an Illinois State Police Crime Sexual Assault Collection Kit, which was then properly sealed and marked. He performed the exam and specimen collection in the presence of Nurse Laura Maida.

¶ 30     Nurse Maida, in turn, would testify that she received an Illinois State Police Crime Sexual Assault Collection Kit in a sealed condition from Doctor Martin. In addition, she collected the clothes that D.M. was wearing when she arrived at Metro South Medical Center and put them in a separate bag, which she then sealed. Maida turned over the sex assault kit and the hospital bag containing D.M.'s clothes to John Cavazos, a security officer who worked at the medical center.

¶ 31     Security Officer Cavazos would testify that he received the sexual assault kit and the hospital bag from Maida, both of which were sealed. He maintained a proper chain of custody over both items and turned them over to Chicago Police Officer William Purvis.

¶ 32     Chicago Police Officer William Purvis would testify that he was assigned to pick up D.M.'s sexual assault kit and her clothing from the Metro South Medical Center on February 23, 2011. After receiving those items from Cavazos, he inventoried them in accordance with police protocol. Officer Purvis was also assigned to photograph and collect evidence from a 1996 Buick Century, which had been transported to the Midlothian Police Department. During his examination of the vehicle, he collected a black knit cap, a black baseball cap, and a black patterned hooded sweatshirt from the rear of the car. He also collected an opened Life Style condom wrapper from the dashboard and an unopened condom from the driver's seat area of the vehicle. Officer Purvis inventoried all the items in accordance with police protocol.

¶ 33    Finally, the parties stipulated that D.M.'s rape kit and clothing were subjected to analysis by Illinois State Police personnel and that DNA recovered from her clothing and rape kit was "matched" to defendant.[1]

¶ 34    After presenting the aforementioned testimony, the State rested its case-in-chief.  Defense counsel renewed his objection to the admission of J.S.'s other crimes testimony.  The court declined to reverse its prior ruling that the evidence was relevant and admissible and reiterated that it would only consider the evidence for a "limited purpose."

¶ 35    Defendant then exercised his right to testify.  He testified that on February 23, 2011, at approximately 8 p.m., he was driving his vehicle in the vicinity of 119th and Harvard when he observed D.M. walking alone.  He "blew the horn at her" and tried to "get her attention.  When she looked over, he "asked her to come to the car," but she declined and instructed him to get out of his car and come talk to her.  Defendant did so.  They began talking and he asked her name, where she was going, and what she was "fittin' to do."  During the course of the conversation, she agreed to "hang out and smoke a couple of blunts."  They both entered his vehicle and defendant drove to a nearby liquor store where he purchased a "pint of vodka smooth."  He then drove over to 115th Street where he purchased 7 grams of marijuana and to a Marathon gas station where he purchased three cigarillos and three loose cigarettes.  D.M. was rolling blunts as defendant drove and they began smoking and talking and "just getting to know each other."  As defendant continued to drive around, they began discussing "sexual things" and he told D.M. that he wanted oral and anal sex.  D.M., in turn, "didn't say nothing at that point."

---

[1] Because the DNA evidence did not play a large role in defendant's trial given that he admitted engaging in sexual activity with D.M. and because it is not relevant to the substance of this appeal, we elect not to detail the DNA stipulations entered into in this case.

¶ 36    Defendant ultimately parked his vehicle in the lot at Ada Park. They continued talking and "rolling more blunts. As they were smoking and drinking, defendant offered D.M. $60 and "she agreed" to engage in sexual activity and told him to pull his pants down. Defendant lowered his pants to his knees and D.M. then performed oral sex on him. After doing so, she removed her pants and reclined across the front seat of the vehicle. Defendant then put a condom on and they had vaginal sex. After he ejaculated, he threw the used condom out of his car window, and they discussed going to a hotel. D.M. agreed to accompany him to a hotel and they left the park. As he was driving, defendant asked D.M. if she wanted to eat before they went to the hotel and she indicated that she did. He then stopped at a McDonald's restaurant located at 147th and Pulaski. He ordered food at the drive thru and then stopped "next door" to the 711 so that he could purchase a box of cigarillos, a box of condoms, and box of cigarettes. He left D.M. in the car and the car running. As he was inside the 711, a police officer entered the store and arrested him. When he was led out of the store, defendant observed D.M. At that time, she was acting "normal." She "wasn't crying" and "made no outcry." Defendant testified that he never forced D.M. to do anything that she did not want to do. He denied that he ever hit her. In addition, D.M. never tried to exit his vehicle.

¶ 37    On cross-examination, defendant testified that although D.M. agreed to perform oral, anal, and vaginal sex in exchange for $60, he never gave her the money. He explained that he intended on doing so at the hotel. Defendant estimated that they were at the park for an hour and a half and that D.M. never told him that she wanted to go home during that time. When asked about the locks in his vehicle, defendant testified that the locks were located on the side panels of the doors and that the locks did not "flip up."

¶ 38    Following defendant's testimony, the defense rested.  The State then called Detective Henry Barsch to testify as a rebuttal witness.  He testified that he and his partner, Matthew Webber, were assigned to investigate into D.M.'s allegations of sexual assault on February 23, 2011.  They conducted an initial interview with her at Metro South.  Afterwards, they conducted a custodial interview of defendant in the presence of Assistant State's Attorney Tami Strickland.  Defendant was informed of his *Miranda* rights and agreed to speak with them.  During that interview, defendant stated that he gave D.M. "three crisp twenty dollar bills" and that she performed oral and vaginal sex in exchange for the money.  Following that interview, Detective Barsch and his partner returned to the hospital to speak with D.M.  While there, they searched her to determine whether she had any money on her.  She only had $5 on her person and an evidence tech took a picture of the bill.

¶ 39    On cross-examination, Detective Barsch acknowledged that none of the reports completed in connection with the case specifically reference "three crisp twenty dollar bills."  The reports simply indicate that defendant offered D.M. $60 in exchange for her engaging in sexual activity with him.

¶ 40    Thereafter, the State presented the stipulated testimony of ASA Strickland.  Pursuant to that stipulation, Strickland would testify that she interviewed defendant on February 23, 2011 in the presence of Detectives Webber and Barsch.  During that interview, defendant stated that he gave D.M. "three crisp twenty dollar bills" and that she gave him oral and vaginal sex in exchange for the money.

¶ 41    In surrebuttal, defendant testified that he never gave D.M. three crisp twenty dollar bills and that he never told anyone that he had done so.

¶ 42    After presenting the aforementioned evidence, the parties delivered closing arguments. After considering the evidence presented and the arguments of the parties, the court found defendant guilty of two counts of criminal sexual assault, explaining: "I do believe there was force, sexual penetration here, I believe it was without the victim's consent."  In doing so, the court indicated that it had paid close attention to D.M.'s demeanor while testifying and that it found her overall testimony to be "credible."  In addition, it found the testimony about D.M.'s encounter with the Midlothian police officers to be "compelling."  The court also found J.S.'s other crimes testimony to be "believable" and "corroborative of the fact that there was no consent" because "defendant acted in a particular way [with J.S.] which was similar to the way he acted with [D.M.]."  The court, however, found defendant not guilty of aggravated criminal sexual assault because it did "not believe the State ha[d] proven that additional element of bodily harm beyond a reasonable doubt."  The court noted that while the Midlothian police officers "testified that apparently they did see some blood on [D.M.'s] face," the medical testimony was "inconclusive" as to whether or not D.M. suffered bodily harm at the hand of defendant.

¶ 43    The cause then proceeded to a sentencing hearing where the parties presented evidence in aggravation and mitigation.  After considering the evidence, the court found that the proper sentence fell "somewhere in the middle" of the applicable sentencing range and sentenced defendant to six years' imprisonment on each count of criminal sexual assault, the sentences to run consecutively for a total of 12 years' imprisonment.  Defendant's posttrial and postsentencing motions were denied and this appeal followed.

¶ 44    ANALYSIS

¶ 45    On appeal, defendant argues that the circuit court abused its discretion when it permitted J.S. to provide other crimes testimony.  Specifically, he argues that the "incident" involving J.S.

"was not sufficiently similar to the charged offense and the prejudice" of the other crimes evidence "greatly outweighed any miniscule probative value, particularly because the evidence in this case was closely balanced." Moreover, he argues the circuit court erred in considering the other crimes evidence relevant and probative with respect to the issue of consent because consent is "not amenable" to proof by other crimes evidence.

¶ 46 The State, in turn, responds that the circuit court "did not abuse its discretion when it allowed defendant's criminal sexual assault of J.S. to establish intent, *modus operandi*, lack of mistake and lack of consent." Even if the admission of the J.S.'s testimony was improper, the State submits that any error was necessarily harmless in light of the significant evidence of defendant's guilt.

¶ 47 The cornerstone governing the admissibility of evidence is relevance. See *People v. Monroe*, 66 Ill. 2d 317, 321 (1977) ("The basic principle that animates our law of evidence is that what is relevant is admissible"). "[R]elevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401) (eff. Jan. 1, 2011). As a general rule, evidence of other crimes or prior bad acts, that is, evidence of crimes or acts for which a defendant is not on trial, is irrelevant and inadmissible if its purpose is merely to show the defendant's propensity to commit criminal acts. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Heard*, 187 Ill. 2d 36, 58 (1999). Such evidence has traditionally been excluded because it "tends to be overly persuasive to a jury, who may 'convict the defendant only because it feels he or she is a bad person deserving punishment.' " *People v. Ward*, 2011 IL 108690, ¶ 24 (quoting *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980)). Section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West

2010)), however, sets forth a "limited exception" to the prohibition against the introduction of other crimes evidence in sex assault cases. *Ward*, 2011 IL 108690, ¶ 25. That provision allows for the introduction of other crimes evidence in such cases and provides that the evidence "may be considered for its bearing on *any matter* to which it is relevant" as long as it is "otherwise admissible under the rules of evidence" (Emphasis added) (725 ILCS 5/115-7.3(b) (West 2010). Accordingly, evidence that a defendant on trial for a sex crime committed a prior sex offense may be admitted not only to establish a defendant's propensity, but also to prove *modus operandi*, intent, motive, identity, or the absence of mistake. *People v. Donoho*, 204 Ill. 2d 159, 170, 176 (2004). Before admitting other crimes sex evidence, however, a court must conduct a balancing test to ascertain the probative value of the evidence and weigh it against the potential of undue prejudice to the defendant. *Ward*, 2011 IL 108690, ¶ 26; 725 ILCS 5/115-7.3(c) (West 2010)). Relevant factors to consider include: (1) the proximity of time between the other offense to the charged offense; (2) the degree of factual similarities between the offenses; and (3) any other relevant facts and circumstances. 725 ILCS 5/115-7.3(c)(1)-(3) (West 2010). On review, the circuit court's ruling concerning the admissibility of other crimes evidence will not be disturbed absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182; *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 40. An abuse of discretion pertaining to an evidentiary ruling will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Donoho*, 204 Ill. 2d at 182.

¶ 48    Here, prior to trial, the State sought to admit evidence that defendant had committed two prior sex offenses before he sexually assaulted D.M. In its motion, the State indicated that it sought to admit the other crimes evidence in accordance with section 115-7.3 of the Code to establish "intent, motive, knowledge, lack of mistake, or accident and propensity." After conducting a

hearing on the matter, the court barred the State from introducing evidence of defendant's prior sexual assault of L.H. in 2006, but held that the State could introduce evidence of his 2008 assault of J.S. The court found that evidence of J.S.'s prior assault was more factually similar to the assault perpetuated against D.M. and that the other crimes evidence relevant and admissible to establish "*modus operandi*, lack of mistake, and also [] the issue of consent." Thereafter, at trial, the court indicated that it considered the other crimes evidence solely with respect to the issue of consent in light of defendant's decision to proceed by way of a consent defense. On review, we cannot agree with defendant's argument that the court abused its discretion by considering the other crimes evidence relevant and probative of the issue of consent.

¶ 49    Defendant's claim that "consent is not amenable to proof by evidence of other crimes" is not well-taken. Initially, we note that the wording of the statute is broad and provides that other crimes evidence is admissible in sex crimes cases and "may be considered for its bearing on *any matter* to which it is relevant" (Emphasis added) (725 ILCS 5/115-7.3(b) (West 2010). Moreover, reviewing courts have routinely held that other crimes evidence is relevant and admissible in sexual assault cases to rebut a defendant's claim of consent and establish that the defendant acted with criminal intent and the absence of an innocent frame of mind when he assaulted his victim and force her to engage in sexual activity against her will. See, *e.g., People v. Stevens*, 2013 IL App (1st)111075, ¶ 42 ("In cases involving criminal sexual assault, *** other crimes evidence is probative to rebut a defendant's claim of consent"); *People v. Williams*, 2013 IL App (1st) 112583, ¶ 36 (recognizing that other crimes evidence is admissible under section 115-7.3 of the Code "to rebut a defendant's claim of consent"); *People v. Boyd*, 366 Ill. App. 3d 84, 91 (2006) (noting that in "cases where the defendant claims the victim consented to the sexual assault, courts have found other-crime evidence relevant to prove defendant's criminal intent or lack of an innocent frame of

mind"); but see *People v. Barbour*, 106 Ill. App. 3d 993, 1000 (1982) (finding that consent was a matter of credibility and that the fact that "two of defendant's former victims testified that they did not consent to defendant's sexual advances is wholly irrelevant to this issue of this complainant's consent"). In light of the foregoing precedent that defendant fails to meaningfully and persuasively distinguish, we conclude that the court's consideration of the other crimes evidence as it pertained to the issue of consent, an issue raised by defendant at trial, did not amount to an abuse of discretion.

¶ 50 Defendant nonetheless argues that the court abused its discretion in its application of the statutorily mandated balancing test. Specifically, he maintains J.S.'s assault and D.M.'s assault shared only "incidental" or "superficial similarities" such that the other crimes evidence "had little (if any) probative value, and instead had a "highly prejudicial effect" on the outcome of his trial.

¶ 51 As set forth above, section 115-7.3(c) of the Code requires a court, prior to admitting other crimes evidence in a sexual assault trial, to consider the probative value of the other crimes evidence and weigh it against any undue prejudicial effect. 725 ILCS 5/115-7.3(c) (West 2010); *Ward*, 2011 IL 108690, ¶ 26. To make this determination, the statute directs the court to consider the proximity in time of the two offenses, the degree of factual similarities of the two offenses, as well as any other relevant facts and circumstances. 725 ILCS 5/115-7.3(c) (West 2010). Generally, the more factual similarities that the other crimes evidence shares with the charged offense, the more relevant and greater probative value the other crimes evidence is considered to be. *Donoho*, 204 Ill. 2d at 184; *Williams*, 2013 IL App (1st) 112583, ¶ 44. When other crimes evidence is being offered to establish *modus operandi*, the level of similarity between the other crime to the charged offense must be "high" such that the two offenses " 'share such distinctive common features as to earmark both acts as the handiwork of the same person.' " *People v.*

*Raymond*, 404 Ill. 2d 1028, 1047 (2004) (quoting *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991)). Where the other crimes evidence is being offered for another purpose other than to establish *modus operandi*, however, mere "general areas of similarity" are sufficient to justify its admissibility. *Donoho*, 204 Ill. 2d at 184; *People v. Childress*, 338 Ill. App. 3d 540, 546 (2003).

¶ 52    Initially, we note that although the circuit court first indicated that evidence of J.S.'s assault was admissible to establish *modus operandi*, lack of mistake, and consent the court ultimately admitted and considered the other crimes evidence solely as it pertained to the issue of consent. Given that the court considered the other crimes evidence for a purpose other than to establish *modus operandi*, it was only necessary that the two crimes shared "general areas of similarity." *Donoho*, 204 Ill. 2d at 184.

¶ 53    Upon consideration, we find that the two crimes shared more than incidental or superficial similarities.  Initially, we note that both crimes occurred within a relatively short three-year time period.  See *Id.* (finding that the 12 to 15 year gap in time between the other crimes evidence and the charged offense was insufficient, by itself, to render the admission of the other crimes evidence an abuse of discretion).  J.S. was assaulted in 2008 and D.M. was assaulted in 2011.  Both victims were young African American teenagers.  J.S. was 15 at the time of her assault while D.M. was 18 years old.  Defendant approached both victims when they were alone and after they had completed late night shopping and transported both victims to isolated areas.  He dragged J.S. to an isolated bike trail and drove D.M. to an isolated "wooded area."  Defendant struck both victims in the head and face and forced both victims to engage in unwanted oral and vaginal sex.  In addition, he evidenced a desire to spend the night with both victims and engage in repeated acts of sexual assault at different locations.  J.S. testified that defendant took her to several different locations throughout the night and engaged in forcible oral and vaginal sex over a prolonged period of time.

D.M., in turn, testified that after defendant first assaulted her in his vehicle, he indicated that he wanted to take her to a hotel[2] and told her that he would drop her off at home in the morning; however, she was able to escape before defendant could assault her again at a different location. Finally, we note that defendant took both victims to a McDonald's restaurant. When considered as a whole, we find the similarities shared between the two offenses to be significant. In so finding, we acknowledge that the two crimes are not identical in all respects with the most notable difference being that D.M.'s assault occurred in a vehicle; however, we do not find this difference so significant that it rendered the other crimes evidence inadmissible. See *People v. Ross*, 395 Ill. App. 3d 660, 676 (2009) (recognizing that the mere existence of some factual disparities between the other crime and the charged offense does not defeat the admissibility of other crimes evidence because no two independent crimes are ever completely identical in every respect).

¶ 54    Even if we were to agree with defendant that the circuit court abused its discretion in admitting the other crimes evidence, we would nonetheless find that reversal is not warranted; rather, any such error was harmless in light of the evidence against him. See *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) (recognizing that the improper admission of other crimes evidence is subject to harmless error review and that any such error is harmless where the defendant suffers no prejudice is not denied a fair trial); *People v. Hall,* 194 Ill. 2dd 305, 339 (2000) (explaining that the erroneous admission of other crimes evidence warrants reversal only where the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different").

---

[2] We note that there appeared to be some confusion in the record regarding hotels. Although J.S. testified that defendant led her near a hotel, there was no evidence that defendant intended to take her to a hotel to continue to sexually assault her. In contrast, D.M. unequivocally testified that defendant evidenced a desire to continue his assault of her at a hotel. What is clear from the record, however, is that defendant sought to spend the night with both of his victims and to continue his assault of them over a prolonged period of time.

¶ 55    Although defendant categorizes the evidence presented at trial as "closely balanced" and submits that the accounts of the assault that he and D.M. offered were "equally plausible," we disagree. We acknowledge that there were no eyewitnesses to the assault; however, D.M.'s testimony was corroborated in certain respects by other evidence. Like the circuit court, we find that the testimony of Midlothian police officers Robert Fitzgerald and Bruce Alton was "compelling." The officers, who both encountered D.M. shortly after the assault, described her demeanor as "hysterical," "very scared," and "visibly shaken." In addition, both officers observed swelling to D.M.'s face, which corroborated her account that defendant struck her. In contrast, defendant's testimony that his interaction with D.M. was consensual and that she agreed to engage in sexual activity with him in exchange for $60 was contradicted by the testimony of Detective Henry Barsch and ASA Strickland. Both witnesses, who took a statement from defendant after his arrest, testified that defendant relayed that he had engaged in sexual activity with D.M. in exchange for "three crisp twenty dollar bills." When Detective Barsch investigated defendant's account and searched D.M., however, she only had $5 on her person. Based on this evidence, we can hardly agree with defendant that the testimony that he and D.M. offered at trial was "equally compelling" such that the other crimes evidence in this case was a material factor in his conviction. Indeed, it is evident from the record that the circuit court, although it considered the other crimes evidence, based its verdict primarily on its review of the testimony offered by defendant and D.M., whom the court found to be a "credible" witness. Accordingly, we conclude that any potential error regarding the admission of other crimes evidence in this case was harmless.

¶ 56    CONCLUSION

¶ 57    The judgment of the circuit court is affirmed.

¶ 58    Affirmed.